Filed 12/23/15  P. v. Flanigan CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDRE DESHAWN FLANIGAN,<br><br>    Defendant and Appellant. | F068332<br><br>(Super. Ct. No. F12904186)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jane Cardoza, Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Andre DeShawn Flanigan of possession of a firearm by a felon. On appeal, Flanigan contends the prosecutor committed acts of prejudicial misconduct during cross-examination and closing argument, the trial court erred in denying his new trial motion based on juror misconduct without an evidentiary hearing, and the cumulative effect of these errors violated his right to due process.  We affirm.

## PROCEDURAL BACKGROUND

The District Attorney of Fresno County filed a second amended information charging Flanigan with assault with a firearm (Pen. Code,[1] §245, subd. (a)(2); count 1), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), and misdemeanor battery (§ 242; count 3).   The information further alleged that Flanigan had suffered a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and served five prior prison terms (§ 667.5, subd. (b)).   Following trial, the jury found Flanigan not guilty on counts 1 and 3, and guilty on count 2, and he admitted the prior conviction allegations.   After denying Flanigan's motion for a new trial, the trial court sentenced Flanigan to a total of nine years in prison.

## FACTUAL BACKGROUND[2]

**Prosecution Evidence**

On May 26, 2012, around 11:00 p.m., Clovis Police Officer Steve Cleaver was dispatched to an apartment complex where Flanigan's girlfriend, Natalie Taylor, lived. When Cleaver arrived, he saw Flanigan exiting the driveway in a green Ford Mustang. Cleaver directed Flanigan to stop his car and asked him his name.   After advising Flanigan that the police had been called to the area for a disturbance possibly involving a firearm, Cleaver directed Flanigan to step out of the car and performed a pat-down search on him.

In the meantime, Clovis Police Corporal Drake Hodge arrived and stopped his police truck in front of Flanigan's car.   Hodge approached the car and observed what appeared to be the handle of a semiautomatic pistol sticking out from underneath the driver's seat.   Hodge called out to Flanigan and asked him if it was a real gun or an

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

[2]    Because the jury acquitted Flanigan on counts 1 and 3, pertaining to his alleged attack on his girlfriend's friend, Victoria Bradshaw, our factual summary focuses on facts underlying count 2 (possession of a firearm by a felon) that is the subject matter of this appeal.

airsoft gun. Flanigan replied that it was a real gun. Hodge then asked if the gun was loaded and Flanigan said yes. At this point, Cleaver placed handcuffs on Flanigan and seated him in the back of his patrol car.

Cleaver later returned to the patrol car and, after reading Flanigan his *Miranda*[3] rights, questioned him about the gun found in his car. Cleaver first asked Flanigan if he had a permit to carry a concealed weapon. Flanigan replied that he did not. Cleaver then asked Flanigan if the gun was his. Flanigan said that it was and that he had purchased it off the street from some guy for $100, but declined to say who he purchased it from. Cleaver asked Flanigan if he thought the gun was stolen. Flanigan replied that it probably was. When asked how the gun came to be on the floorboard of his car, Flanigan said he removed it from Taylor's apartment for her safety because she was intoxicated and out of control.

Cleaver continued asking Flanigan "clarifying questions" about the gun and how it came to be in his possession. During this time, Flanigan told Cleaver "the firearm had actually been in his vehicle for the past … either two days or two weeks" (the officer testified he could not specifically recall which time period Flanigan stated). A little later, Flanigan "changed the story" and said the gun was not his but was actually purchased by Taylor. Cleaver asked Flanigan why Taylor purchased the gun. Flanigan responded that she lived in a bad neighborhood and needed it for protection. Cleaver then asked Flanigan if he felt he needed protection with the firearm on the streets, to which Flanigan responded, "What do you think?"

**Defense Evidence**

Flanigan testified in his own defense, maintaining that the gun belonged to Taylor and claiming that, for safety reasons, he removed the gun from her apartment and placed it in his car on the night of May 26, 2012. Flanigan claimed he only learned about the

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

3.

gun the previous day, when he went to visit Taylor at her apartment. At that time, she showed him the gun and said she got it from one of her relatives.

After placing the gun in his car on the night of May 26, 2012, Flanigan returned to Taylor's apartment twice to retrieve some of his belongings to place in his car. When he returned to the apartment the second time, he found the front door locked and his key no longer worked. Unable to get back inside Taylor's apartment, Flanigan returned to his car. The police stopped him as he was driving out of the apartment complex.

Flanigan's account of what happened next differed in a number of respects from the account given by Cleaver. According to Flanigan's testimony, after directing Flanigan to step out of his car, the police officer subjected him to a pat-down search and placed him in handcuffs without telling him why he was being handcuffed. The officer then placed him in the patrol car and walked away. At some point, the officer returned to the patrol car, opened the door, and directed Flanigan to stand up. Flanigan then heard a voice ask him, "That Glock you have under your seat, is it real?" After Flanigan answered yes, the police placed him back inside the patrol car.

Flanigan testified that he had been sitting in the patrol car for a while, "when all of a sudden, an officer got in the car; and he asked me, 'Where did you get the gun?'" The officer did not read Flanigan his *Miranda* rights before asking him about the gun. Flanigan told the officer that he removed the gun from his girlfriend's apartment for her safety because she was drinking and out of control.

Flanigan was honest with the officer from the beginning and did not recall the officer ever asking him any clarifying questions about his possession of the gun. The officer never asked him whether he had a concealed weapons permit, where he bought the gun, or whether it was stolen. And Flanigan never told the officer that he bought the gun for $100, that it was probably stolen, or that it had been in his car for the past two days or past two weeks.

4.

## *DISCUSSION*

### I.      Alleged Prosecutorial Misconduct During Cross-examination

Flanigan contends the prosecutor committed prejudicial misconduct during cross-examination by asking him whether Cleaver was lying during his testimony.  We disagree.

### A.      *Background*

During cross-examination, the prosecutor questioned Flanigan, in relevant part, as follows:

> "Q  And it's your testimony that Officer Cleaver, when he was up there testifying, that he lied?
>
> "A  Yes, he did.
>
> "[DEFENSE COUNSEL]:  Objection.  That's improper.  Prosecutorial misconduct.
>
> "THE COURT:  All right.  First of all, it's not prosecutorial misconduct.  And, however, you can rephrase your question.
>
> "[THE PROSECUTOR]:  Q  When Officer Cleaver testified that he asked you about the firearm, was that true?
>
> "A  When he asked me about the firearm?  I don't understand what you're saying.
>
> "Q  You heard Officer Cleaver testify this morning and this afternoon; correct?
>
> "A  Yes, I did.  [¶] … [¶]
>
> "Q  What you heard him say, is that an accurate portrayal of what happened that night?
>
> "A  I don't understand.  I don't even know what 'portrayal' means.  Can you explain that to me?
>
> "Q  Yes.  What you heard him testify to—
>
> "A  Uh-huh.

"Q –is what he testified to what happened?

"A Partly. Partly true; partly not.

"Q What part wasn't the truth?

"A All the questions he saying that I asked and, um, that I—that he asked me and I answered, um, saying that I was never in handcuffs, you know, before. A lot of little things that he—he lied about.

"Q So it's your testimony, then, that Officer Cleaver got on the stand and lied?

"[DEFENSE COUNSEL]: Objection. Same objection.

"THE COURT: Overruled.

"[FLANIGAN]: Yes."

## B.    Analysis

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34 (*Morales*), 44; accord, *People v. Farnam* (2002) 28 Cal.4th 107, 167; *People v. Wilson* (2005) 36 Cal.4th 309, 337 (*Wilson*).)

Both parties acknowledge that case law presents differing views on whether a prosecutor's "'were they lying'" questions are reversible error. They must be evaluated in context. They are not always admissible or always inadmissible. (*People v. Chatman* (2006) 38 Cal.4th 344, 380–384 (*Chatman*).) "'[W]ere they lying'" questions are impermissible when they are argumentative or designed to elicit speculative or irrelevant testimony, but are permissible if the witness has personal knowledge that allows him to

6.

provide competent testimony "that may legitimately assist the trier of fact in resolving credibility questions." (*Id.* at p. 384.)

"A defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide *insight* on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken." (*Chatman*, *supra*, 38 Cal.4th at p. 382, italics added.) For example, the defendant might claim that he had a "better vantage point from which to observe the event" or knows of "facts that would show a witness's testimony might be inaccurate." (*Id.* at p. 383.) In instances where he "knows the other witnesses well, he might know of reasons those witnesses might lie." (*Id.* at p. 382.) A defendant's insight into facts or motives "would properly assist the trier of fact in ascertaining whom to believe." (*Id.* at p. 383.)

Although Flanigan did not know Cleaver personally, Flanigan testified as a percipient witness and had personal knowledge of the events. (See *Chatman*, *supra*, 38 Cal.4th at p. 382.) By choosing to testify, Flanigan put his own veracity in issue. Because his testimony contradicted that of Cleaver, it was permissible for the prosecutor to seek to clarify Flanigan's position and give him the opportunity to explain the divergent testimony. Under the circumstances—including the fact the prosecutor's questions elicited additional information from Flanigan—the questions "appropriately assisted the jury in resolving the issue of whose testimony was more credible. There was no misconduct." (*People v. Collins* (2010) 49 Cal.4th 175, 206; accord, *People v. Hawthorne* (2009) 46 Cal.4th 67, 96–98; *People v. Tafoya* (2007) 42 Cal.4th 147, 177–179; *Chatman*, *supra*, 38 Cal.4th at p. 383.) This was not a case where the prosecutor improperly used "were they lying" questions to berate the defendant and to force him to call officers liars in an attempt to inflame the passions of the jury. (See *People v. Zambrano* (2004) 124 Cal.App.4th 228, 242.) For all these reasons, we reject Flanigan's claim that the prosecutor committed misconduct during cross-examination.

## II.     Alleged Prosecutorial Misconduct During Closing Argument

Flanigan next contends that the prosecutor committed prejudicial misconduct during closing argument by misstating the reasonable doubt standard. He also contends that, in overruling defense counsel's objection to the prosecutor's argument and reminding the jury to follow the law provided by the court, the trial court effectively ratified the prosecutor's misstatement of the law and misinstructed the jury on the burden of proof, giving rise to structural error that is reversible per se. Concluding no prosecutorial misconduct occurred, we reject these contentions.

### A.     *Background*

During the opening portion of the prosecutor's closing argument, the following exchange occurred:

> "[THE PROSECUTOR]: You've heard the phrase 'reasonable doubt' throughout this trial and the instructions, and that's the burden that must be met in this case. It's proof that leaves you with an abiding conviction that the charge is true. It doesn't have to eliminate all doubt, because everything in life is open to some possible or imaginary doubt. What does this mean?
>
> "It just simply means what is reasonable in this case? What does the evidence show and is it reasonable to believe that the evidence shows the defendant's guilty?
>
> "[DEFENSE COUNSEL]: Objection. Misstates the law.
>
> "THE COURT: All right. Ladies and gentlemen, again, you determine what the facts are from the evidence. And if what counsel state in their arguments is contrary to the law that I have provided to you, you're to follow the law as provided by the Court.
>
> "So with that, [prosecutor], you may continue.
>
> "[THE PROSECUTOR]: Just think about what is reasonable. Is defendant's story reasonable or is Victoria's [the alleged victim of counts 1 & 3] testimony reasonable? Considering the testimony of the officers, the weapon that was found in defendant's car, which story is reasonable?"

8.

Later, outside the presence of the jury, defense counsel reiterated his objection to the prosecutor's argument and the trial court responded as follows:

> "[DEFENSE COUNSEL]: …Your Honor, I believe that during her argument [the prosecutor] made improper argument about the reasonable doubt standard and lowered the burden by arguing that it's a determination of which is a more reasonable description of events when, in fact, the instruction that's given to the jury regards whether or not they're left with an abiding conviction that the charge is true.

> "This is the most important jury instruction given in any criminal case. And when I objected, the Court did not rule on the objection and did not address the improper argument or re-instruct the jury with regard to that, and I'm concerned about that. [¶] … [¶]

> "THE COURT: All right. So, [defense counsel], first of all, concerning the objection, as I previously instructed the jury, if counsel misstates the law, they're to follow the law as the Court has instructed them.

> "Now, concerning your objection whether she misstated the law, first of all, her—[the prosecutor's] PowerPoint clearly—and she made reference to it, and I've reviewed my notes—[the prosecutor] clearly stated that what the burden was, was beyond a reasonable doubt, to an abiding conviction. That was on her PowerPoint. That was her argument.

> "She then got to the part of reviewing the statements made and whether they are reasonable, and that's—and so I don't—based on what I heard, her argument and her statements in her argument, there's no reasonable likelihood that the jury would construe or apply her comments, her argument, in an objectionable way.

> "So, therefore, it—given that my instruction to the jury to follow the law as I've provided addresses the issue of any misstatement—which I don't believe she misstated, but if she did misstate it, it was ever so slight. I mean, if—if it could be construed in that way, reasonable people can differ.

> "However, it's the Court's opinion that she did not misstate the law. She did not lighten the People's burden of proving each and every element beyond a reasonable doubt to an abiding conviction. And so given that, the Court has addressed it and has made its ruling that it was not a misstatement of the law. But in the event that it was, it was—there's no

9.

likelihood the jury could have misconstrued those statements in any way that would be prejudicial to your client."

After this exchange, defense counsel made his closing argument and the prosecutor made her rebuttal argument. The prosecutor concluded her rebuttal with these statements:

> "Ladies and gentlemen, I ask that you just consider all of the evidence. You think about what's reasonable. If you have two explanations, which you have here, you have the defendant's explanation of what happened and then you have the explanation by Victoria and the officers, is one unreasonable? And I submit to you that the defendant's version of what happened is unreasonable, does not make sense. And if you have an unreasonable conclusion, then you get rid of that. [¶] Ladies and gentlemen, I ask that you find the defendant guilty of all the counts charged. Thank you."

### B.  Analysis

"'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.] 'Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide.'" (*Wilson*, *supra*, 36 Cal.4th at p. 337.)

"'[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.'" (*People v. Hill* (1998) 17 Cal.4th 800, 829–830 (*Hill*).) However, "[a]t closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom." (*Morales*, *supra*, 25 Cal.4th at p. 44.) Furthermore, a "'prosecutor is entitled to comment on the credibility of witnesses based on the evidence adduced at trial.'" (*People v. Young* (2005) 34 Cal.4th 1149, 1191–1192.)

10.

Applying these rules here, we find that it is not reasonably likely that the jury interpreted the prosecutor's comments in the way Flanigan contends. According to Flanigan, the prosecutor's comments improperly suggested that the jury's task, in applying the beyond a reasonable doubt standard was to weigh the evidence presented by both sides, and to find in favor of the side whose version was more reasonable, rather than determining whether the prosecution had met its burden of proving all the elements of the charged offenses beyond a reasonable doubt. However, when read as a whole, the prosecutor's argument does not support Flanigan's interpretation. (See *People v. Dennis* (1998) 17 Cal.4th 468, 522 ["we must view the statements in the context of the argument as a whole"].)

Viewed in context, the complained-of statements of the prosecutor—asking the jury to consider whether Flanigan's or the prosecution witnesses' version of events was reasonable—did not pertain to the legal standard of proof beyond a reasonable doubt but instead pertained to the witnesses' credibility, which was a key issue at Flanigan's trial. As the trial court aptly observed in addressing defense counsel's objection below, after mentioning the prosecution's burden of proof, which the court noted for the record was accurately reflected in the prosecutor's accompanying PowerPoint presentation, the prosecutor shifted to reviewing witnesses' statements. She essentially argued that the prosecution witnesses' version of events was more credible than Flanigan's based on the evidence presented at trial. Such evidence included Cleaver's testimony that Flanigan provided multiple and conflicting explanations regarding the firearm the police officers found in his car. The prosecution's argument that Flanigan's version of events was unreasonable compared to that of the prosecution witnesses constituted a fair comment on the issue of the credibility of witnesses and did not misstate the beyond a reasonable doubt standard or shift the burden of proof to the defense.

However, it bears noting that Flanigan *did* have the burden of proof with respect to the affirmative defense he raised to count 2 (felon in possession of firearm), which was

11.

the only count on which he was ultimately convicted by the jury. As acknowledged by both sides during closing argument, there was no dispute that the prosecution's evidence established the essential elements of count 2. Thus, the critical issue before the jury was whether Flanigan proved his defense of necessity, which he had the burden of proving by a preponderance of the evidence.[4] Flanigan's credibility and the reasonableness of his version of events compared to that of the testifying police officers were certainly appropriate factors for the jury to weigh in determining whether he met his burden of proving the affirmative defense, and the jury could properly reject the defense if it concluded that the officers' accounts were more credible or reasonable than Flanigan's.

Moreover, the prosecutor's statements here are distinguishable from the one found improper by our Supreme Court in *Hill*, *supra*, 17 Cal.4th 800, a case Flanigan cites in support of his prosecutorial misconduct claim. In *Hill*, the prosecutor improperly shifted the burden of proof to the defendant when she explained reasonable doubt to the jury as follows: "'[I]t must be reasonable. It's not all possible doubt. Actually, very simply, it means, you know, you have to have a reason for this doubt. *There has to be some evidence on which to base a doubt.'*... 'There must be *some evidence* from which there is a reason for a doubt. You can't say, well, one of the attorneys said so.'" (*Hill*, *supra*, 17

---

**4** The trial court correctly instructed the jury on the defense of necessity under CALCRIM No. 3403 as follows: "The defendant is not guilty of Possession of a Firearm by a Felon as charged in Count Two if he acted because of legal necessity. [¶] In order to establish this defense, the defendant must prove that: [¶] 1. He acted in an emergency to prevent a significant bodily harm or evil to himself or someone else; [¶] 2. He had no adequate legal alternative; [¶] 3. The defendant's acts did not create a greater danger than the one avoided; [¶] 4. When the defendant acted, he actually believed that the act was necessary to prevent the threatened harm or evil; [¶] 5. A reasonable person would also have believe that the act was necessary under the circumstances; [¶] AND [¶] 6. The defendant did not substantially contribute to the emergency. [¶] The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the defendant must prove that it is more likely than not that each of the six listed items is true."

Cal.4th at p. 831.) The California Supreme Court explained that "to the extent [the prosecutor] was claiming there must be some affirmative evidence demonstrating a reasonable doubt, she was mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence. [Citation.] On the other hand, [the prosecutor] may simply have been exhorting the jury to consider the evidence presented, and not attorney argument, before making up its mind." (*Hill*, *supra*, 17 Cal.4th at pp. 831–832.) The Supreme Court said the question was arguably close, but it concluded it was reasonably likely that the jury understood the comments "to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt." (*Id.* at p. 832.) The Supreme Court reversed the verdict in *Hill*, but it did so based upon "the many acts of prosecutorial misconduct and other errors that plagued that trial." (*People v. Booker* (2011) 51 Cal.4th 141, 186.)

Unlike *Hill*, this case was not plagued with multiple acts of prosecutorial misconduct, and, as just discussed, the prosecutor was not trying to explain to the jury the concept of reasonable doubt. Rather, the prosecutor properly commented on the credibility of witnesses based on the evidence at trial. In reviewing the prosecutor's argument in its entirety, we found no statements telling the jury, either explicitly or implicitly, that the defense had the burden to produce evidence demonstrating a reasonable doubt as to Flanigan's guilt. As previously discussed, however, to the extent the prosecutor's comments could be construed as inviting the jury to weigh the reasonableness of both sides' versions of events in applying the preponderance of an evidence standard applicable to Flanigan necessity defense, such comments were not inaccurate nor did they misstate or lessen the prosecution's burden of proving the elements of the charged offenses beyond a reasonable doubt.

Finally, the jury was instructed with CALCRIM No. 200 regarding its obligation to follow the law as set forth in the instructions, and to disregard attorney comments that were inconsistent with the instructions. The jury was also instructed with CALCRIM

13.

No. 222, which told them that "[n]othing that the attorneys say is evidence." CALCRIM No. 220 correctly instructed the jury about the presumption of innocence and the prosecutor's burden of proving guilt beyond a reasonable doubt.

We presume the jury followed these instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436; see also *People v. Prince* (2007) 40 Cal.4th 1179, 1295.) We also presume the "'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'" (*People v. Seaton* (2001) 26 Cal.4th 598, 646; see also *People v. Samayoa* (1997) 15 Cal.4th 795, 844.) Thus, we conclude that any lingering danger the jury might have misinterpreted or been misled by the prosecutor's comments was eliminated by the jury instructions the trial court gave in this case.

## III. Denial of New Trial Motion

Flanigan contends the trial court erred in denying his new trial motion without holding an evidentiary hearing based on a juror's declaration alleging that "a fellow juror injected erroneous law into the deliberations." Assuming without deciding Flanigan did not forfeit this contention by failing to raise it below, we reject it on the merits.

"[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415.) "'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a *strong possibility* that prejudicial misconduct has occurred. Even [then], an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.'" (*People v. Duran* (1996) 50 Cal.App.4th 103, 113.)

14.

"'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.] '"A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion."'" (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) Such an abuse is not present here.

The declaration of Juror No. 1, on which the new trial motion was based, did not demonstrate a strong possibility that prejudicial misconduct occurred as Flanigan contends. In relevant part, Juror No. 1's declaration alleged that, after nine jurors voted to indicate they believed the defense had met its burden of proving the elements of the necessity defense, Juror No. 10 "told the group that because the group did not unanimously accept the defense of necessity that the verdict had to be guilty on Count 2."

Flanigan contends that Juror No. 10's alleged statement indicates the juror committed misconduct by injecting an erroneous statement of law into the jury deliberations by incorrectly telling his fellow jurors that "a jury must reach a guilty verdict where jurors fail to reach a unanimous decision on the merits of a defense." However, this is simply Flanigan's interpretation of the alleged statement, and is not clearly supported by the statement itself. Contrary to Flanigan's suggestion, Juror No. 10's statement was not worded as a general legal statement. Rather, it specifically referred to the jury's deliberations in this particular case and was not necessarily meant as a statement of law.

In light of the fact Flanigan did not dispute that the prosecution's evidence showed he was a felon in possession of a firearm, is it very possible that, at the time of Juror No. 10's alleged statement, the jurors had already decided that the prosecution had met its burden of proof on count 2, and that they would therefore *have* to return a guilty verdict on count 2 *unless* they unanimously agreed that Flanigan proved his necessity defense. Since they apparently were unable to reach such agreement, under this scenario, Juror No. 10's alleged statement that the verdict *had* to be guilty on count 2 would not

15.

necessarily have constituted a misstatement of the law since the jury would have already had found the prosecution had met its burden of proof on count 2. Thus, Juror No. 10's statement could simply have been meant as a comment on how matters stood at that point in the deliberations and not meant as a statement of law.

Of course, this is all speculation. Our point is that Flanigan's argument assumes Juror No. 10's alleged statement had one very particular meaning which happens to supports his juror misconduct claim. However, the actual wording of the statement does not support a single interpretation and, depending on the context in which it was made, could have a number of possible meanings.

In short, we find the evidence Flanigan presented in support of his new trial motion was insufficient to demonstrate a strong possibility that prejudicial misconduct occurred in this case. Accordingly, the trial court did not abuse its discretion in denying Flanigan's new trial motion without conducting an evidentiary hearing.

## IV. Cumulative Error

Flanigan contends the cumulative effect of his claims of error is such that his right to due process was denied and reversal of his convictions is warranted. Having concluded there were no errors, we conclude there was no cumulative error that deprived Flanigan of due process. (*People v. Vieira* (2005) 35 Cal.4th 264, 294.)

## *<u>DISPOSITION</u>*

The judgment is affirmed.

_____

HILL, P.J.

WE CONCUR:

_____

LEVY, J.

_____

PEÑA, J.